## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **JUDY YOUNG,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | **CIVIL ACTION NO.** |
| | ] | **2:18-CV-00455-KOB** |
| **ALATRADE FOODS, LLC,** | ] | |
| | ] | |
| **Defendant.** | ] | |

## MEMORANDUM OPINION

In this employment discrimination case, Plaintiff Judy Young alleges that a supervisor working for her employer, Defendant AlaTrade Foods, LLC, sexually harassed her over the course of several months. According to Ms. Young, AlaTrade let the sexual harassment continue until the company transferred her to a position that she physically could not perform because of her pregnancy and vertigo and then terminated or constructively discharged her.

Ms. Young brings eight claims against AlaTrade arising out of the alleged harassment and termination or constructive discharge. She brings five employment discrimination claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and 42 U.S.C. § 1981: (1) hostile work environment based on sexual harassment; (2) retaliation for complaining about sexual harassment; (3) discrimination on the basis of sex; (4) discrimination on the basis of pregnancy;

1

and (5) discrimination on the basis of race. And she brings three tort claims under Alabama law: (1) invasion of privacy; (2) assault and battery; and (3) negligent and/or wanton hiring, supervision, training, and/or retention. (*See* Doc. 17 at 7–14).

AlaTrade has moved for summary judgment on all of Ms. Young's claims. (Doc. 28). According to AlaTrade, Ms. Young quit her job so she cannot show that the company terminated or constructively discharged her for being African-American, female, and/or pregnant, or in retaliation for complaining about sexual harassment. AlaTrade also contends that no evidence supports Ms. Young's allegations of a hostile work environment, invasion of privacy, assault and battery, and negligent hiring, supervision, training, and/or retention, and that no basis exists to hold the company liable for those claims.

As further explained below, the court will deny summary judgment on Ms. Young's hostile work environment claim and state law tort claims: genuine disputes of material fact exist as to each of those claims because evidence shows that Ms. Young suffered sufficiently offensive harassment and reported such to AlaTrade. But the court will grant summary judgment for AlaTrade on Ms. Young's claims for retaliation and discrimination on the basis of race, sex, and pregnancy: no evidence supports the inference that Ms. Young suffered an adverse employment action under Title VII or § 1981 as required to state any of those

claims.

## I.  STANDARD OF REVIEW

A trial court can resolve a dispositive issue on summary judgment *only* when the moving party establishes two essential elements: (1) no genuine disputes of material fact exist; *and* (2) the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

Under the first element of the moving party's summary judgment burden, "'[g]enuine disputes [of material fact] are those in which the evidence is such that a reasonable jury *could* return a verdict for the non-movant.'"  *Evans v. Books-A-Million*, 762 F.3d 1288, 1294 (11th Cir. 2014) (emphasis added) (quoting *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996)).  And when considering whether any genuine disputes of material fact exist, the court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in favor of the non-moving party.  *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015).

A non-moving party's self-serving sworn testimony can create genuine issues of fact.  *See United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018) ("A litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment.");  *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) ("To be sure, Feliciano's sworn statements are self-serving,

but that alone does not permit us to disregard them at the summary judgment stage.").  But only *factual* allegations in sworn testimony based on personal knowledge can defeat summary judgment; *conclusory* allegations cannot.  *See Stein*, 881 F.3d at 857 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).  And even if the court doubts the veracity of self-serving testimony, the court cannot make credibility determinations at the summary judgment stage. *Feliciano*, 707 F.3d at 1252 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

Consistent with the summary judgment standard, the court will present the facts of this case in the light most favorable to Ms. Young.  The court draws most of the facts from Ms. Young's sworn testimony at her deposition.  AlaTrade challenges most of Ms. Young's testimony for lack of documentary support, and the person who Ms. Young alleges sexually harassed her "emphatically den[ies]" each of Ms. Young's accusations against him.  (*See* Doc. 28-17 at ¶¶ 6, 28).  But the court cannot weigh evidence or make credibility determinations at the summary judgment stage.  And the court notes that these facts may not be the facts presented at trial.

## II.    BACKGROUND

Ms. Young began working at AlaTrade's chicken processing facility in Albertville, Alabama in August 2016.  At first, she worked full time on the

production line separating chicken. Then, about a month after she started working at AlaTrade, she requested to work part time three days a week so she could devote more time to her son and her schooling. AlaTrade granted her request and transferred her to the cube table where she graded whole chicken breasts three days a week. Soon after, AlaTrade transferred her to the box room where she assembled boxes to hold chicken. In the box room, she was sometimes required to climb ladders to pick boxes off the top of six-foot-tall stacks.

In January 2017, Ms. Young discovered that she was pregnant with twins. She asked the box room supervisor, Shane Craig, for the pregnancy-related accommodation of not having to climb ladders to retrieve boxes. Ms. Young testified that Mr. Craig never acted on her request. (*See* Doc. 28-9 at 40). According to Ms. Young, the lead supervisor in the box room, Sheila, told Ms. Young that she "just [could not] be accommodating people in the box room like that all [sic] because when somebody get [sic] pregnant." (*Id.*).

Ms. Young testified that the supervisor for the chicken deboning line, Jose Corona, began visiting Ms. Young in the box room. Though Mr. Corona was not a supervisor of the box room, Mr. Craig testified that Mr. Corona had supervisory authority over Ms. Young because "every supervisor has authority over every employee in the building." (Doc. 28-2 at 14).

According to Ms. Young, Mr. Corona regularly struck up casual

conversation with her, but, over time, his statements grew more inappropriate and ultimately turned sexually explicit and offensive. Ms. Young testified that he first told her, "I like you." (Doc. 28-9 at 42). Ms. Young asked what he meant and Mr. Corona said, "oh, come on. You know what I'm trying to tell you. I like you." (*Id.*). Ms. Young told him that she was married.

Ms. Young testified that Mr. Corona twice tried to convince her to leave the plant with him to "have a sexual encounter" and proposed that they take off work every other Wednesday to "get together." (Doc. 28-9 at 43, 65). She also testified that, when he learned that she was pregnant, Mr. Corona said that he was upset because he did not want anyone else to have her. (*Id.* at 43). According to Ms. Young, Mr. Corona made sexual hand gestures with his smock in front of her and told her that she had "nice breasts" that were "a nice size for sucking." (*Id.* at 63).

Ms. Young testified that she complained to her supervisor, Adam Motley, about Mr. Corona sexually harassing her, but the harassment did not stop. According to Ms. Young, Mr. Corona kept visiting her in the box room; her co-worker in the box room testified that Mr. Corona did so two to three times a day when Ms. Young was working and stood very close to her. (Doc. 31-5 at ¶ 3). Ms. Young testified that, on one occasion, Mr. Corona pointed out a pole in the box room, talked to her about strippers, and told her, "[i]f I could just get you one of those poles and bend you over and—he said something to the effect [of] pop your

ass or your ass something."  (Doc. 28-9 at 44).

Ms. Young testified that she again complained about Mr. Corona's sexual harassment to Mr. Motley and reported the pole comments, but the harassment continued.  She testified that Mr. Corona grabbed her from behind, told her that she had a "fine sexy ass," touched her arm and back, whispered and blew in her ear, and said "you like that."  (Doc. 28-9 at 45, 69).  According to Ms. Young, he also either "touched" or "grazed"—but did not "grab"—her buttocks.  (*Id.* at 45–46, 59).  Finally, Ms. Young testified that Mr. Corona showed her unsolicited pictures of himself partially undressed and exposing himself.  (*Id.* at 70).

According to Ms. Young, in early May 2017, she told AlaTrade's vice president, Jarl O'Barr, that she needed to speak to him "about being sexually harassed out here, discriminated out here, working in this hostile environment." (Doc. 28-9 at 46).  At a follow-up meeting with Mr. O'Barr on an unknown date in May, Ms. Young recounted her allegations of sexual harassment by Mr. Corona. (Doc. 28-9 at 48, 80; Doc. 31-5 at ¶ 8).  She also told Mr. O'Barr that she was experiencing race and pregnancy discrimination, though Ms. Young did not testify as to what specific acts of discrimination she reported to Mr. O'Barr.  (*See* Doc. 28-9 at 80).

On May 17, 2017, Mr. Craig told Ms. Young that AlaTrade was transferring her out of the box room and placing her back on the chicken production line.  Ms.

Young told him that she could not work on the line anymore because she had vertigo and had to stand too far back from the table because of her pregnancy. Mr. Craig would not accept Ms. Young's stated limitations and, according to Ms. Young, responded, "either do what I tell you to do or go home." (Doc. 28-9 at 53). As Ms. Young prepared to leave, Mr. Craig continued to tell her to obey him or leave, and, according to Ms. Young, at some point "turned red in his face like he was just very angry and mad about something." (*Id.*). Ms. Young testified that Mr. Craig told her, "I'm telling you to do—go where I told you to go or you need to leave the premises. You need to leave," and, "hey, hey, let's go. Get out of here. Get off—get out of here. Get out the building. I need you to leave the building now." (*Id.* at 53). Ms. Young left AlaTrade's facility and considered herself terminated.

Ms. Young called the staffing company that had placed her at AlaTrade to inquire about her final paycheck. Ms. Young testified that her contact at the staffing company, Patricia Peralta, informed her that AlaTrade "[did not] want [her] back on the premises" because she "got terminated for insubordination and misconduct." (Doc. 28-9 at 55; *see* Doc. 31-3 at 2).

AlaTrade reported on a separation form that Ms. Young "[q]uit, due to being moved out of box room." (Doc. 28-8 at 2). AlaTrade replaced Ms. Young with Kim McGowan, who is white and was not pregnant. (Doc. 28-2 at 41).

The court next analyzes each of Ms. Young's claims against AlaTrade arising out of these facts.

## III. ANALYSIS

### A. Hostile Work Environment

In Count One of her amended complaint, Ms. Young contends that Mr. Corona's alleged sexual harassment of her over the course of several months and AlaTrade's failure to act on her complaints of sexual harassment created an actionable hostile work environment. For the following reasons, the court agrees.

To establish a hostile work environment claim based on sexual harassment, an employee must show five elements:

> (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

*Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (citing *Henson v. City of Dundee*, 682 F.2d 897, 903–05 (11th Cir. 1982)).

Here, Ms. Young has satisfied the first three elements of her hostile work environment claim. As a woman, she belongs to a protected group. Ms. Young testified that Mr. Corona subjected her to unwelcome sexual harassment by, among other actions, trying to convince her to leave work to have a sexual encounter with

him, making sexual hand gestures towards her, telling her that she had "nice breasts" that were "a nice size for sucking," grabbing her from behind, telling her that he wanted to "bend [her] over" a stripper pole, and showing her pictures of him exposing himself. And all of Mr. Corona's alleged sexual harassment was based on Ms. Young's sex.

So, Ms. Young's hostile work environment claim turns on the fourth element—that she suffered harassment "sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment"—and the fifth element—that "a basis for holding [AlaTrade] liable" exists. *See Mendoza*, 195 F.3d at 1245.

Under the fourth element of a hostile work environment claim, "[e]stablishing that harassing conduct was sufficiently severe or pervasive to alter an employee's terms or conditions of employment includes a subjective and an objective component." *Mendoza*, 195 F.3d at 1246 (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21–22 (1993)). To satisfy the subjective component, "[t]he employee must 'subjectively perceive' the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment." *Id.* (quoting *Harris*, 510 U.S. at 21–22). To satisfy the objective component, the employee's "subjective perception must be objectively reasonable"; *i.e.*, "[t]he environment must be one that 'a reasonable person would find hostile or abusive.'" *Id.* (quoting

*Harris*, 510 U.S. at 21). And "the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Id.* (internal quotations and citations omitted).

For the objective component of the analysis, "[t]he Supreme Court has provided a non-exclusive set of factors to consider in determining whether an environment is hostile." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 647 (11th Cir. 1997). These factors include "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Mendoza*, 195 F.3d at 1246 (citing *Allen*, 121 F.3d at 647) (citing in turn *Harris*, 510 U.S. at 23). And the objective severity of harassment depends on the totality of circumstances. *Id.*

In this case, a genuine dispute exists of whether Mr. Corona's alleged "harassment was sufficiently severe or pervasive to alter the terms and conditions of [Ms. Young's] employment and create a discriminatorily abusive working environment." *See Mendoza*, 195 F.3d at 1245. First, evidence shows that Mr. Corona's harassment was frequent—Ms. Young testified that Mr. Corona harassed her from December 2016 to May 2017 and her coworker testified that Mr. Corona visited the box room two to three times each day only when Ms. Young worked. (*See* Doc. 28-9 at 41, 47; Doc. 31-5 at ¶ 3). And, based on Ms. Young's deposition

testimony, the totality of Mr. Corona's conduct was objectively hostile and abusive. Ms. Young testified that Mr. Corona made several sexually offensive remarks and gestures to her—he said she had a "fine sexy ass" and "nice breasts" that were "a nice size for sucking" and lewdly grabbed his smock and made sexual hand gestures in front of her. (Doc. 28-9 at 45, 63). He propositioned her for sex—he asked her to take off work with him on Wednesdays to have sex, said he did not want anyone else to have her after learning that she was pregnant, and expressed desire to "bend [her] over" and "pop [her] ass" on a stripper pole. (*Id.* at 43–44). On one occasion, he whispered in Ms. Young's ear, blew in her ear, said "you like that," grabbed her from behind, and touched her back, arm, and buttocks. (*Id.* at 45, 69). And he showed her unsolicited pictures of him exposing himself. (*Id.* at 70). From this testimony, reasonable jurors could find objectively severe, abusive, humiliating, and threatening conduct that altered the terms or conditions of Ms. Young's employment. So a genuine issue exists as to the fourth element of her hostile work environment claim.

Turning to the fifth and final element of her hostile work environment claim, "a basis for holding the employer liable" exists "if it knew, or reasonably should have known, of the harassment and failed to take prompt remedial actions." *Allen*, 121 F.3d at 647.

In this case, evidence shows that AlaTrade knew or should have known

about the alleged sexual harassment and failed to take any remedial actions. Ms. Young testified that she reported Mr. Corona's conduct on at least three occasions between December 2016 and May 2017, but that AlaTrade never intervened and the harassment continued until the company transferred her out of the box room in May 2017. So reasonable jurors could find that a basis exists for holding AlaTrade liable for the sexual harassment.

Because a genuine dispute of material fact exists as to each element of Ms. Young's hostile work environment claim, the court will deny AlaTrade's motion for summary judgment as to that claim.

### B.    Retaliation

Next, in Count Two of her amended complaint, Ms. Young contends that AlaTrade terminated or constructively discharged her in retaliation for her reporting sexual harassment to AlaTrade's vice president in violation of Title VII and 42 U.S.C. § 1981.

The *McDonnell Douglas* burden-shifting analysis applies to Title VII and § 1981 retaliation claims based on circumstantial evidence. *Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1310 (11th Cir. 2016); *Bryant v. Jones*, 575 F.3d 1281, 1307 (11th Cir. 2009). Pursuant to this framework, the plaintiff must first establish a *prima facie* case of retaliation. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007). "To establish a *prima facie* case of

retaliation . . . , 'the plaintiff must show (1) that she engaged in statutorily protected expression; (2) that she suffered an adverse employment action; and (3) that there is some causal relation between the two events.'" *Id.* (quoting *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994)). Under the second element, an "adverse employment action" is any "serious and material change in the terms, conditions, or privileges of employment." *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001) (emphasis omitted).

Here, Ms. Young asserts that she suffered an adverse employment action because AlaTrade terminated or constructively discharged her. The court disagrees.

In an attempt to show that she was terminated, Ms. Young first relies on her *opinion* that AlaTrade terminated her because, on May 17, 2017, it transferred her to the chicken production line and her supervisor told her to go home after she refused the transfer. (*See* Doc. 28-9 at 23, 55, 79) (Ms. Young's deposition testimony that AlaTrade terminated her); (Doc. 28-9 at 91) (Ms. Young's EEOC charge alleging that AlaTrade terminated her).

But Ms. Young's version of the *facts* of her last day fail to show termination. She contends that, after she told her supervisor that she could not and would not work on the chicken production line, her supervisor "turned red in his face like he was just very angry and mad about something" and told her, "either do what I tell

you to do or go home"; to either obey him or leave; "I'm telling you to do—go where I told you to go or you need to leave the premises. You need to leave"; and "hey, hey, let's go. Get out of here. Get off—get out of here. Get out the building. I need you to leave the building now." (Doc. 28-9 at 53). But these statements only show that her supervisor told her to go home after she refused to work her new assignment; they do not support a reasonable inference that AlaTrade terminated her employment.

Ms. Young next asserts that information from her contact at her staffing agency, Patricia Peralta, shows that AlaTrade terminated her. According to Ms. Young, after she left AlaTrade, she called Ms. Peralta to inquire about her last paycheck. Ms. Peralta called Ms. Young back at some point and told her that AlaTrade did not "want [her] back on the premises" and "you cannot go back on the premises because you got terminated for insubordination and misconduct." (Doc. 28-9 at 55). And a handwritten, unaddressed, and unsworn letter dated May 22, 2017 and signed by Patricia Peralta states, "I was told by Human Resources that Judy Young was no longer employed there. She was terminated for insubordination and conduct." (Doc. 31-3 at 2).

But Ms. Young's deposition testimony concerning the phone call with Ms. Peralta is only hearsay evidence of someone else's opinion about what happened to Ms. Young. She does not allege what *facts* Ms. Peralta relied on in reaching the

conclusion that Ms. Young was terminated.  Like her own opinion, Ms. Young's version of Ms. Peralta's opinion cannot raise a genuine issue of fact to survive summary judgment.

And the letter purportedly written by Ms. Peralta also fails to raise a genuine issue of fact.  Putting aside that the letter is double hearsay—Ms. Young offers the letter to show what Ms. Peralta said that someone at AlaTrade Human Resources said—the letter is not addressed to anyone, it is not a sworn statement, and Ms. Young offers *no* background for the letter.  In her brief in opposition to summary judgment, Ms. Young only cites the letter as evidence that she was terminated. She does not state to whom Ms. Peralta sent the letter nor explain why Ms. Peralta wrote the letter.  And no testimony from Ms. Peralta exists on the record.  So, again, Ms. Young leaves the court only with someone else's hearsay opinion that she was terminated and no facts to support an inference that AlaTrade terminated her.

Also, Ms. Young herself admitted that she quit on her June 1, 2017 EEOC intake questionnaire.  (Doc. 28-13 at 6).  And the May 23, 2017 "AlaTrade Status Change/Separation Form" states that Ms. Young "[q]uit, due to being moved out of boxroom."  (Doc. 28-8 at 2).  So the court finds that no evidence raises a genuine issue of whether AlaTrade terminated Ms. Young.

Next, Ms. Young contends that, even if AlaTrade did not terminate her, the

company constructively discharged her because it assigned her to a job that she physically could not perform, thus leaving her no choice but to resign. The court disagrees.

A constructive discharge can be an adverse employment action to satisfy a plaintiff's *prima facie* case of retaliation or discrimination. *See Fitz v. Pugmire Lincoln-Mercury, Inc.*, 348 F.3d 974, 977 (11th Cir. 2003). "A constructive discharge occurs when a discriminatory employer imposes working conditions that are 'so intolerable that a reasonable person in [the employee's] position would have been compelled to resign.'" *Id.* (quoting *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997)).

Ms. Young contends that AlaTrade compelled her to resign when it reassigned her to the chicken production line because she physically could not perform the job because of her vertigo and pregnancy. While the court does not doubt that assigning an employee to a job that she cannot perform could be a constructive discharge, no evidence capable of raising a genuine issue of fact supports Ms. Young's contention in this case.

Ms. Young testified that she had vertigo that caused her to vomit on one occasion when she worked on the chicken production line before AlaTrade transferred her to the box room. (*See* Doc. 28-9 at 28–29, 36). But a single instance of vomiting does not support a reasonable inference that she could not

work on the chicken production line at all months later.  And Ms. Young testified that, because her pregnancy was showing in May 2017, she would "have to stand back" from the line and would not be "really propped up enough to do [her] job efficiently."  (Doc. 28-9 at 34).  The court does not doubt that a pregnancy with twins *could* make working on a production line intolerable, but no evidence exists in this case to support an inference that Ms. Young would suffer such unbearable difficulties.  No reasonable juror could find that only having to stand back from the line and work inefficiently would compel any pregnant person to resign.

Finally, Ms. Young contends that the transfer out of the box room and back to the chicken production line was itself an adverse employment action or constructive discharge because of the favorable working conditions in the box room.  In contrast with the relatively warm and quiet box room, on the production line, she would have to work in the cold and experience loud noises from machinery.  But these minor changes in working conditions were not a "serious and material change in the terms, conditions, or privileges of employment" or "so intolerable that a reasonable person in [Ms. Young's] position would have been compelled to resign."  *See Davis*, 245 F.3d at 1239 (emphasis omitted); *Fitz*, 348 F.3d at 977 (quotations and citations omitted).  So no evidence shows that the transfer was an adverse employment action or a constructive discharge.

Because no genuine dispute exists of whether Ms. Young suffered an

adverse employment action, a required element for a retaliation claim, the court will grant summary judgment for AlaTrade on the retaliation claim.

### C.     Sex/Pregnancy/Race Discrimination

Next, in Count Three and Count Four of her amended complaint, Ms. Young contends that AlaTrade terminated or constructively discharged her because of her sex, pregnancy, and/or race.

Like her retaliation claim, the *McDonnell Douglas* burden-shifting framework applies to Ms. Young's sex, pregnancy, and race discrimination claims. *See Holland v. Gee*, 677 F.3d 1047, 1055 (11th Cir. 2012); *Wright v. Southland Corp.*, 187 F.3d 1287, 1290 n.3 (11th Cir. 1999).  So, for each of these claims, Ms. Young must first establish a *prima facie* case of discrimination, which includes showing that she suffered an adverse employment action.  *See Thomas*, 506 F.3d at 1363.  But, as stated above, no genuine dispute of material fact exists as to whether Ms. Young suffered an adverse employment action, so the court will grant summary judgment for AlaTrade on Ms. Young's sex, pregnancy, and race discrimination claims.

### D.     Invasion of Privacy

Turning to Ms. Young's state law claims, in Count Five of her amended complaint, she brings an invasion of privacy claim against AlaTrade because, according to Ms. Young, the company "authorized, ratified and/or condoned" Mr.

Corona's "intruding into Plaintiff's private seclusion by making sexual comments and inquiries, by touching and groping private parts of her body, and other acts . . . ." (Doc. 17 at ¶¶ 66–67).

To state an invasion of privacy claim under Alabama law, a plaintiff must show "an offensive or objectionable prying or intrusion into the plaintiff['s] private affairs or concerns." *Busby v. Truswal Sys. Corp.*, 551 So. 2d 322, 324 (Ala. 1989). Where, as here, the plaintiff alleges an invasion of privacy based on sexual harassment, the plaintiff must show "that the intrusion would be so offensive or objectionable that a reasonable person subjected to it would experience outrage, mental suffering, shame, or humiliation." *Ex parte Atmore Cmty. Hosp.*, 719 So. 2d 1190, 1194 (Ala. 1998) (citing *Busby*, 551 So. 2d at 323). And if, as Ms. Young does here, the plaintiff brings an invasion of privacy claim against the employer of the alleged harasser, she must also show a basis for holding the employer vicariously liable for its employee's conduct. *See Busby*, 551 So. 2d at 326.

Alabama law sets a high bar for what constitutes sufficiently offensive or objectionable conduct to support an invasion of privacy claim. *See, e.g., Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1309 (11th Cir. 2007) (a supervisor's harassment of an employee, including asking her to "blow" him, breathing down her neck, and unzipping his pants in front of her, "was not

sufficiently outrageous as a matter of Alabama law for [an invasion of privacy or intentional infliction of emotional distress claim].”); *McIsaac v. WZEW-FM Corp.*, 495 So. 2d 649, 652 (Ala. 1986) (finding that a supervisor did not commit an invasion of privacy when he repeatedly tried to convince an employee to have an affair with him and tried to kiss her); *Logan v. Sears, Roebuck & Co.*, 466 So. 2d 121, 124 (Ala. 1985) (“Even the dire affront of inviting an unwilling woman to illicit intercourse has been held by most courts to be no such outrage as to lead to liability.”); *Pressley v. City of Anniston & Daryl Abernathy*, 2016 WL 4679135, at *22 (N.D. Ala. Sept. 7, 2016) (“[I]n the absence of any physical contact or physically-threatening conduct by Mr. Abernathy, the court finds that his sex-based propositions and other comments aimed at Ms. Pressley were not sufficiently outrageous or personally intrusive to constitute a triable invasion of privacy claim.”).

But the Alabama Supreme Court has found sufficient evidence to support an invasion of privacy claim in cases involving sexual harassment similar to the conduct alleged against Mr. Corona in this case. First, in *Busby*, the Alabama Supreme Court reversed the Circuit Court’s grant of summary judgment on an invasion of privacy claim where, among other actions, a male supervisor invited female employees to swim in his pool in the nude with him; put his arm around female employees, grabbed their arms, and stroked their necks; asked a female

employee to hold his penis while he urinated; compared female employees' nipple sizes; and said he would arrange for them to be able to masturbate while working. *See Busby*, 551 So. 2d at 324. The Alabama Supreme Court found that "[a] jury could reasonably determine from this evidence that [the supervisor] pried or intruded into the plaintiffs' sex lives in an offensive or objectionable manner and thereby invaded their right of privacy." *Id.*

In *Phillips v. Smalley Maint. Servs., Inc.*, 435 So. 2d 705 (Ala. 1983), a company president repeatedly locked his office door when he called a female employee in for conversation; inquired about how often she and her husband had sex and what "positions" they used; asked whether she had ever engaged in oral sex and insisted that she have oral sex with him or lose her job; covered the office window with paper to prevent anyone from seeing inside before the employee forced her way out of the office; and struck her across the buttocks with his hand when she was in the process of leaving. 435 So. 2d at 707. The Alabama Supreme Court had "no hesitancy in expressing [its] conclusion that these facts [met] all the requisite elements" for an invasion of privacy claim. *Id.* at 711.

In *Atmore*, before his employer corrected the harassment and absolved itself of liability, an employee looked up a female co-worker's skirt on more than one occasion, made several lewd comments to her, and asked her to meet him outside of work hours for non-business purposes. 719 So. 2d at 1194. The Alabama

Supreme Court found that these initial actions constituted sufficient evidence of invasion of privacy.  *Id.*

In this case, Ms. Young has testified to egregious sexual harassment similar to the harassment in *Busby*, *Phillips*, and *Atmore* that constituted sufficient evidence of an invasion of privacy under Alabama law.  Specifically, Ms. Young testified that Mr. Corona told her that she had a "fine sexy ass"; and he told her that she had "nice breasts" that were "a nice size for sucking"; and he told her that he would like to "bend her over" a stripper pole and "pop [her] ass out"; and he grabbed his smock and made sexual hand gestures towards her; and he propositioned her for sex on several occasions; and he told her that he was upset that she was pregnant because he did not want anyone else to have her; and he either "touched" or "grazed" her buttocks; and he grabbed her from behind, touched her back and arms, and whispered and blew in her ear.  And, pushing the alleged harassment over the sufficiently offensive threshold, Ms. Young testified that Mr. Corona showed her unsolicited pictures of him exposing himself.  Reasonable jurors could determine from Ms. Young's testimony that Mr. Corona committed an "offensive or objectionable prying or intrusion into [her] private affairs or concerns" and thus committed invasion of privacy under Alabama law.  *See Busby*, 551 So. 2d at 324.

But AlaTrade, not Mr. Corona, is the defendant in this case.  So Ms. Young

must show a basis for holding AlaTrade vicariously liable for the invasion of privacy. *See Busby*, 551 So. 2d at 326.

An employer is vicariously liable for its employee's invasion of another's privacy if the employer ratifies the employee's conduct. *Atmore*, 719 So. 2d at 1195. "An employer ratifies conduct if[] (1) the employer has actual knowledge of the tortious conduct; (2) based on this knowledge, the employer knew the conduct constituted a tort; and (3) the employer failed to take adequate steps to remedy the situation." *Id.*

Ms. Young attempted to make her employer aware of her harasser much like the plaintiff did in *Whitford v. Sub-Line Assocs., Inc.*, 2017 WL 3118810 (N.D. Ala. July 21, 2017). In *Whitford*, the court found sufficient evidence to support an invasion of privacy claim against the plaintiff's supervisor. 2017 WL 3118810, at *8. In discussing whether the plaintiff's employer could be vicariously liable for the supervisor's torts, the court found that the company's manager admitted that she was aware of the supervisor's harassing conduct and that the plaintiff twice reported her supervisor's sexual harassment to managers. But the company never investigated the plaintiff's complaints and the harassment continued until the company terminated her. The court found this evidence to be "legally sufficient to support a finding that [the employer] knew of [the supervisor's] wrongful conduct, knew or should have known that such conduct was a legally wrongful act under

Alabama law, and yet failed to take adequate steps to remedy the situation," and thus "legally sufficient to support a finding that [the employer] ratified [the supervisor's] wrongful acts through implicit approval." *Id.* at *9 (citing *Potts v. BE & K Const. Co.*, 604 So. 2d 398, 400 (Ala. 1992)).

Here, evidence shows that, like the plaintiff in *Whitford*, Ms. Young reported her harasser several times, but AlaTrade took no action. Ms. Young testified that she complained to her supervisors about Mr. Corona's sexual harassment of her on three occasions. She twice reported him to her supervisor, Adam Motley, which resulted in no corrective action. She then reported Mr. Corona to AlaTrade's vice president, Jarl O'Barr. Mr. O'Barr granted her a follow-up meeting at which she complained of Mr. Corona's alleged sexual harassment. But, according to Ms. Young, AlaTrade never acted on her complaints before she left the company.

Reasonable jurors could infer from Ms. Young's testimony about the number of times that she reported Mr. Corona that AlaTrade "knew of [Mr. Corona's] wrongful conduct, knew or should have known that such conduct was a legally wrongful act under Alabama law, and yet failed to take adequate steps to remedy the situation." *Whitford*, 2017 WL 3118810, at *9. Thus, a genuine issue of facts exists as to AlaTrade's vicarious liability for the invasion of privacy and the court will deny the motion for summary judgment as to that claim.

## E. Assault and Battery

Next, in Count Six of her amended complaint, Ms. Young brings a state law assault and battery claim against AlaTrade because, according to Ms. Young, the company "ratified and/or condoned" Mr. Corona's conduct that amounted to assault and battery. (Doc. 17 at ¶ 71).

To state a claim for battery under Alabama law, a plaintiff must show that someone intentionally touched her in a hostile manner. *Wright v. Wright*, 654 So. 2d 542, 544 (Ala. 1995). To state a claim for assault under Alabama law, a plaintiff must show "an intentional, unlawful offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a wellfounded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented." *Id.* (citations and quotations omitted); *see also Surrency v. Harbison*, 489 So. 2d 1097, 1104 (Ala. 1986) ("A successful assault becomes a battery.") (citations and quotations omitted). And if, as Ms. Young does here, the plaintiff brings an assault and battery claim against the employer of the alleged tortfeasor, the plaintiff must show a basis for holding the employer vicariously liable for the torts of its employee. *See Busby*, 551 So. 2d at 326.

Ms. Young testified that Mr. Corona intentionally "touched" or "grazed"— but did not "grab"—her buttocks, grabbed her from behind, and touched her back

and arms.  Ms. Young did not welcome or solicit these sexually-charged touches. So a genuine dispute of fact exists as to whether Mr. Corona committed an assault and battery of Ms. Young.  *See Atmore*, 719 So. 2d at 1194 ("Hayes touched her waist, rubbed against her when passing her in the hall, poked her in the armpits near the breast area, and touched her leg. . . .  [E]ach of these touchings was intentional, was conducted with sexual overtones, and was unwelcome. These factual assertions constituted substantial evidence that Hayes committed a battery."); *Portera v. Winn Dixie of Montgomery, Inc.*, 996 F. Supp. 1418, 1437 (M.D. Ala. 1998) (finding "a question of fact as to whether the touching constituted an assault and/or battery" when the plaintiff was "shocked" that her supervisor touched her buttocks and put his hand in her blouse).

Turning to AlaTrade's liability, as stated above, Ms. Young reported Mr. Corona's conduct at least three times but AlaTrade took no corrective action.  So, reasonable jurors could find that AlaTrade "knew of [Mr. Corona's] wrongful conduct, knew or should have known that such conduct was a legally wrongful act under Alabama law, and yet failed to take adequate steps to remedy the situation." *Whitford*, 2017 WL 3118810, at *9.  Thus, a genuine issue exists as to AlaTrade's liability for the assault and battery.  The court will deny summary judgment as to that claim.

**F.    Negligent and/or Wanton Hiring, Supervision, Training, and/or Retention**

Finally, in Count Seven of her amended complaint, Ms. Young brings a state law claim for "negligent and/or wanton hiring, supervision, training, and/or retention" against AlaTrade because, according to Ms. Young, the company "negligently and/or wantonly failed to adequately hire, supervise, train, and/or negligently retained, its agents or employees which proximately caused the sexually harassing acts against the Plaintiff." (Doc. 17 at ¶ 75).

To state a claim for negligent hiring, supervision, training, and/or retention against the employer of someone who creates a hostile work environment, the plaintiff must show that the employer breached a duty regarding the harasser's training, retention, and/or supervision that proximately caused the plaintiff's injuries. *See Keel v. Banach*, 624 So. 2d 1022, 1026 (Ala. 1993) (setting out those elements); *Whitford*, 2017 WL 3118810, at *10 (applying those elements to a negligence claim involving a hostile work environment). To establish a duty, the plaintiff must show that the employer had "notice or knowledge, either actual or presumed, of [the harasser's] unfitness." *Armstrong Bus. Servs., Inc. v. AmSouth Bank*, 817 So. 2d 665, 682 (Ala. 2001) (citations and quotations omitted). And the employer's breach of its duty becomes wanton, as opposed to just negligent, when evidence shows "reckless indifference to the consequences of [the breach], or . . . a failure or omission to do something, with reckless indifference to the consequences

28

of such failure or omission." *Id.* at 679 (citations and quotations omitted).

Here, Ms. Young testified that she reported Mr. Corona's conduct at least three times, that AlaTrade never intervened, and that egregious sexual harassment—rising to the level of an actionable hostile work environment, invasion of privacy, and assault and battery—continued. Reasonable jurors could thus conclude that AlaTrade had notice of Mr. Corona's unfitness and recklessly failed to take any corrective action. So a genuine dispute of material fact exists as to Ms. Young's negligent and/or wanton hiring, supervision, training, and/or retention claim; that claim will survive summary judgment.

## IV.    CONCLUSION

For the reasons stated above, by separate order, the court will **GRANT IN PART** and **DENY IN PART** AlaTrade's motion for summary judgment. (Doc. 28).

Specifically, the court will **GRANT** the motion for summary judgment as to Ms. Young's Title VII and § 1981 claims for retaliation and discrimination on the basis of sex, race, and pregnancy. The court will **DISMISS WITHOUT PREJUDICE** those claims.

The court will **DENY** the motion for summary judgment with respect to Ms. Young's Title VII and § 1981 claim for hostile work environment and her state law claims for invasion of privacy, assault and battery, and negligent and/or wanton

hiring, supervision, training, and/or retention. Those claims will proceed to trial.

      **DONE** and **ORDERED** this 6th day of September, 2019.

_Karon O. Bowdre_
_____
**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT
JUDGE